UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TZ MANOR, LLC, PONDVIEW CORP., and
PARKFIELD PROPERTIES (as assignee of
EXCHANGE AUTHORITY LLP, Trustee of the
Almeida Parkfield Exchange Trust), as Tenants in
Common,

                             Plaintiffs,

      -v-

RICHARD F. DAINES, M.D., Commissioner of the
New York State Department of Health, ROBERT P
DOUGHERTY, Director of the New York State
Department of Health, Division of Home and
Community Based Care, JUDITH R. MOONEY, Co-
Director of the New York State Department of Health,
Division of Home and Community Based Care,
MARYBETH FADER, Director, ACF CON
Certification Unit of the New York State Department
of Health, Division of Home and Community Based
Care, ALAN J. LAWITZ, ESQ., Associate Attorney,
Bureau of House Counsel, New York State
Department of Health, and THE LONG HILL
ALLIANCE COMPANY, INC.,

                           Defendants.

Case No. 08-CV-3293 (KMK)

OPINION AND ORDER

Appearances:

Sanford F. Young, Esq.
New York, NY
*Counsel for Plaintiffs*

Scott Joseph Spiegelman, Esq.
Office of the Attorney General of the State of New York
New York, NY
*Counsel for Defendants Richard F. Daines, M.D., Robert P. Dougherty, Judith R. Mooney,
Marybeth Fader, Alan J. Lawitz, Esq.*

David Eugene Nardolillo, Esq.
O'Connell & Aronowitz Attorneys at Law

Albany, NY
*Counsel for Defendant The Long Hill Alliance Co.*

KENNETH M. KARAS, District Judge:

Plaintiffs TZ Manor, LLC ("TZ Manor"), Pondview Corp. ("Pondview"), and Parkfield Properties ("Parkfield") (collectively "Plaintiffs") have filed an amended complaint in this action after this Court dismissed their initial complaint over two years ago. *See TZ Manor, LLC v. Daines*, No. 08-CV-3293, 2009 WL 2242436 (S.D.N.Y. July 28, 2009) ("*TZ Manor I*"). Plaintiffs again allege that officials of the New York State Department of Health (collectively the "State Defendants" or "DOH") engaged in various acts relating to the operation of an Adult Home in Nyack, New York, located on property owned by Pondview and Parkfield. These acts, taken together, allegedly constituted a deprivation of Plaintiffs' property without just compensation and without due process of law, in violation of the Fifth Amendment's Takings Clause and the Fourteenth Amendment's Due Process Clause. Plaintiffs' Amended Complaint also includes a claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause and several state common law claims. The State Defendants and Defendant Long Hill Allliance Co., Inc. ("Long Hill") have separately moved to dismiss Plaintiffs' Amended Complaint. For the reasons stated herein, both motions are granted with respect to the federal claims, supplemental jurisdiction over the state law claims is declined, and the Amended Complaint is dismissed in its entirety.

## I.  Background

### A.  Facts

The factual allegations in the Amended Complaint (Dkt. No. 45) are substantially the same as those in Plaintiffs' initial Complaint (Dkt. No. 1), which are discussed in *TZ Manor I*.

2

2009 WL 2242436, at *1-3.  Familiarity with that opinion is assumed.  The following are the

essential facts as alleged in the Amended Complaint, which the Court accepts as true for

purposes of these Motions.

In October 2002, Pondview and Exchange Authority LLP acquired 51 Mountainview

Ave., Nyack, New York ("the Property") as tenants-in-common via a foreclosure sale by the

United States Department of Housing and Urban Development ("HUD").  *See Pondview Corp. v.*

*Russand Inc.*, No. 0822/03, slip op. at 2-5 (N.Y. Sup. Ct. Mar. 24, 2004) ("*Mar. 24, 2004*

*Pondview Decision & Order*") (describing history of the Property's prior ownership and

Plaintiffs' acquisition).[1]  (Am. Compl. ¶¶ 23-24, 28.)  At some point thereafter, Exchange

Authority LLP assigned its rights to Parkfield.  (*Id.* ¶¶ 26-27.)  The Tappan Zee Manor, a 100-

bed Adult Home (the "Adult Home"), sits on the Property, and was, at the time of the Property's

acquisition, operated by Andrew Blatt ("Blatt").  Blatt's predecessor in interest Eleanor Blatt had

held a series of leases on the Property beginning in 1996 and was issued a license by the State of

New York Department of Health ("DOH") to operate the Adult Home in June 1998.  (*Id.* ¶¶ 24,

32, 37-39, 41, 43, 45-46.)  DOH had issued Blatt a temporary operating license on or about June

25, 2002.  (*Id.* ¶ 47.)

TZ Manor applied for a temporary operating license for the Adult Home from DOH on

October 4, 2002.  (*Id.* ¶ 30.)  DOH denied the application on February 10, 2003, because there

was "an alternate claimant asserting leasehold rights in the Adult Home."  (*Id.*)  (This "alternate

---

[1] At this Court's request, the Parties have submitted copies of several unpublished orders
of the New York Supreme Court in related litigation.  This Court may take judicial notice of
these rulings both because they are incorporated by reference in the Amended Complaint and
because they are matters of public record.  *See, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406, 425 (2d Cir. 2008); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d
Cir. 1998).

claimant" was presumably Blatt, though the Amended Complaint does not make this crystal clear.)  At about the same time, Plaintiffs commenced litigation in New York state court against the previous owners and tenants at the Adult Home, seeking their eviction.  As relevant here, this litigation resulted in a Justice of the Supreme Court granting Plaintiffs injunctive relief including, among other things, appointment of a "temporary operator and receiver" for the Adult Home pursuant to N.Y. C.P.L.R. § 6401(a).  *Mar. 24, 2004 Pondview Decision & Order*, slip op. at 11.  On April 20, 2004, the court substituted Defendant Long Hill as the Adult Home's "Temporary Receiver and Interim Operator" (Am. Compl. ¶ 50), and the DOH notified Long Hill on July 6, 2004 that it would "authorize[] the temporary operation of Tappan Zee Manor Adult Home by Long Hill" pursuant to the Supreme Court's receivership order, (*id.* ¶ 51).  The Supreme Court terminated Long Hill's status as receiver on March 3, 2006.  (*Id.* ¶ 52.)

Following this order, Long Hill "provided the State Court with a closing statement for the period ending on July 2, 2006."  (*Id.* ¶ 53.)  Plaintiffs allege, however, that Long Hill did not cease operating the Adult Home even after the receivership was terminated; instead, through a series of letters between Plaintiffs' representatives and DOH officials, it became clear that DOH had "authorized [Long Hill] to act as temporary operator [of the Adult Home] pending approval of an application for change of operator."  (*Id.* ¶ 63.)  (These communications are discussed in greater detail in *TZ Manor I.  See* 2009 WL 2242436, at *2-3.)  A DOH attorney, Defendant Alan J. Lawitz ("Lawitz"), acknowledged in a June 27, 2007 letter to Plaintiffs' general counsel that DOH was aware that Long Hill had retained a "portion of operational revenue [derived from the Adult Home] to pay for its services," but Lawitz stated that DOH had "no objection" to this "[i]n the absence of other arrangements between the parties for payment of [Long Hill's] services."  (Am. Compl. ¶ 64.)  Plaintiffs responded that they had not "authorized []or approved

4

any payments to Long Hill post-receivership and, in fact, have never been advised upon what basis these funds [that Long Hill had retained] have been taken from the facility."  (*Id.* ¶ 66.) When Plaintiffs asked for an explanation of DOH's actions, Lawitz wrote in a July 24, 2007 email:

> Following the termination of the court-appointed receivership of Long Hill Alliance Company, Inc., there was a clear need for [DOH] to authorize Long Hill to continue to act as interim operator of Tappan Zee Manor, as there was no other individual or entity that had received [DOH] approval to operate the facility, and [DOH] did not wish to take action to require the closure of the facility and transfer of its residents. . . .
>
> [DOH] has authority to issue operating certificates under Social Services Law (SSL) section 460-d for the operation of adult homes serving dependent residents . . . .  Under SSL section 461-c, the operator and the residents enter into admission agreements under which the operator agrees to provide the services required by law, in consideration of the resident's payment for such services.  No individual or entity other than the approved operator is legally authorized to participate in the operating revenue of an adult home. . . . In most cases, when the operator does not own the real property, the operator is making rental payments under a lease to the landlord.  Because of the unique and litigious circumstances in this case, there is no current lease between the real property owner and the interim operator [Long Hill]. . . . As you know, [DOH] is currently reviewing an application for change of operator of this adult home. . . . [DOH] will try to continue to expedite this review.

(*Id.* ¶ 68.)

New York State regulations define an "adult home" as an "adult-care facility established and operated for the purpose of providing long-term residential care, room, board, housekeeping, personal care and supervision to five or more adults unrelated to the operator."  N.Y. Comp. Codes R. & Regs. tit. 18, § 485.2(b).  Under the New York Social Services Law, no adult home (or other adult-care facility regulated by DOH) "shall be operated unless it shall possess a valid operating certificate issued [by DOH] specify[ing] [inter alia] who the operator of the facility shall be . . . ."  N.Y. Soc. Serv. Law § 460-b(1).  Except in the case of receivership, discussed later, no entity that does not possess an operating license issued by the DOH may run an Adult

5

Home.  *See id.* § 461-b(2)(c) (making "[t]he knowing operation of an adult care facility without the prior written approval of [DOH]" a class A misdemeanor); N.Y. Comp. Codes R. & Regs. tit. 18, § 485.5(i).  DOH may issue operating licenses if the proposed facility meets certain standards set forth in the Social Services Law and regulations promulgated thereunder.  N.Y. Soc. Serv. Law § 460-b(2).

The application process to become an operator of an Adult Home proceeds in two parts. The regulations generally require a putative operator to satisfy DOH that (among other things) the applicant possesses the "character and competence" to operate the facility, N.Y. Comp. Codes R. & Regs. tit. 18, § 485.6(b), that it possesses "sufficient financial resources" to do so, *id.* § 485.6(a)(iv), and that it "has developed a . . . program of operation" that complies with applicable law, *id.* § 485.6(a)(iii).  "[P]art I" of the application requires a putative operator to provide DOH with evidence of the public need for the facility and the applicant's ability to run it.  *See id.* § 485.6(d).  DOH has 90 days from "the receipt of all required information from the operator and all required recommendations and information from local or State agencies or other sources" to make a decision on a "request for part I approval."  *Id.* § 485.6(e).  Once it passes part I, the putative operator, within 90 days of part I approval, submits part II of the application, which involves, among other things, detailed plans for the administration and operation of various aspects of the facility and the Adult Home's proposed services and policies.  *See id.* § 485.6(f)(1).  The regulations do not appear to give DOH a deadline for making a decision on part II of an operating license application.

In this case, "after the issue of site control had been clarified" by the Supreme Court, on November 22, 2006, TZ Manor applied for a temporary operator's license for the Adult Home. (Am. Compl. ¶ 90.)  DOH told TZ Manor that an application for a *permanent* operator's license

was necessary, and TZ Manor alleges that it applied for one on March 22, 2007.  (*Id.* ¶¶ 91-92.)

DOH approved part I of TZ Manor's application on October 3, 2007, *TZ Manor I*, 2009 WL

2242436, at *3, and approved part II on May 9, 2008, (Am. Compl. ¶ 95).[2]  TZ Manor assumed

the operation of the Adult Home on May 16, 2009.  (*Id.* ¶ 70.)

Plaintiffs brought the present action on April 2, 2008 against Long Hill and the various

State Defendants, all DOH officials.[3]  The Amended Complaint contains eight claims.  The first

five are § 1983 claims, and each of these is asserted against both the State Defendants and Long

Hill except for Count 5.  In Count 1, Plaintiffs allege that Long Hill's continuing to serve (with

the State Defendants' approval) as temporary operator of the Adult Home from the termination

of its receivership until TZ Manor's operating license application was approved in May 2008

deprived them of "substantive due process."  Specifically, according to Plaintiffs, Defendants'

actions deprived Plaintiffs of their "rights and indicia of ownership, possession and operation of

the Adult Home" and resulted in the "confiscat[ion] and redirect[ion] [of] all rents and revenues

---

[2] Plaintiffs characterize this as "delay" that was "unreasonable."  (Am. Compl. ¶ 94.)
The Amended Complaint points out that DOH approved part II of TZ Manor's application one
month after this action was initially brought, which might support that conclusion.  (Am. Compl.
¶ 95.)   The Court cannot determine from the facts alleged in the Amended Complaint whether
the timing of DOH's actions complied with the requirements of its regulations, which require
only that DOH make a decision on part I of an application 90 days after "the receipt of all
required information" from the applicant *and* other sources.  N.Y. Comp. Codes R. & Regs. tit.
18, § 485.6(e).

[3] Specifically, the State Defendants are Richard F. Daines, M.D., Commissioner of DOH,
Robert P. Dougherty, Director of the Division of Home and Community Based Care for DOH,
Judith R. Mooney, Co-Director of the Division of Home and Community Based Care, Marybeth
Fader, Director of the ACF CON Certification Unit of the Division of Home and Community
Based Care, and Alan J. Lawitz, Esq., Associate Attorney in DOH's Bureau of House Counsel.
(Dkt. No. 45.)  The Amended Complaint does not specify whether these individuals are sued in
their individual or official capacities, but all Parties appear to assume that they are not being
sued solely as officials.  Neither DOH itself nor New York State is a Defendant.

that derived from the Adult Home to Long Hill."  (*Id.* ¶ 72.)  Count 2 is a "violation of due process" claim, alleging that the State Defendants violated state law in "extend[ing] Long Hill's tenure" as operator of the Adult Home.  (*Id.* ¶ 77.)  Count 3 alleges that the same events constituted a "deprivation of property without just compensation," which the Court will treat as a takings claim.  (*Id.* ¶¶ 81-82.)  Count 4 is an Equal Protection claim based on the same allegations.  (*Id.* ¶ 85.)  In Count 5, Plaintiffs allege that the State Defendants' "delay" in approving TZ Manor's application for an operating license was "unreasonable, especially in the context of . . . [the State Defendants'] authorizing and effectively extending Long Hill's reign as receiver and operator of the Adult Home."  (*Id.* ¶ 94.)  The State Defendants' actions, Plaintiffs assert, were "arbitrary, capricious and irrational" and violated "Plaintiff's Constitutional Guaranties of Due Process and Equal Protection, as well as not to be deprived of their property."  (*Id.* ¶ 96.)  Counts 6 through 8 are state law claims for tortious interference with contract, "rent[] and use and occupancy," and unjust enrichment.  (*Id.* ¶¶ 98-107.)  As damages, Plaintiffs seek "rent from Defendants for the time period from March 3, 2006 to May 16, 2008 . . . totaling $4,903,401.95" (*id.* ¶ 75), as well as an additional $300,590.24, the amount by which Long Hill was allegedly unjustly enriched when it "removed" this money "from the facility" between March 3, 2006 and December 31, 2007, (*id.* ¶ 107).

> B.  Procedural History

This action was filed on April 4, 2008 (Dkt. No. 1), approximately one month before DOH approved part II of TZ Manor's operating license application.  This Court granted the State Defendants' motion to dismiss without prejudice on July 28, 2009, giving Plaintiffs thirty days to file an amended complaint.  *See TZ Manor I*, 2009 WL 2242436, at *11.  Plaintiffs initially appealed that decision (Notice of Appeal (Dkt. No. 33)), but they also sought in this Court to file

a motion to re-argue, relying on the Second Circuit's opinion, issued August 7, 2009, in *Spinelli v. City of New York*, 579 F.3d 160 (2d Cir. 2009), (Letter from Sanford F. Young, Esq., to the Ct. (Aug. 12, 2009) (Dkt. No. 34)).[4]  After this Court noted that it lacked jurisdiction to entertain Plaintiffs' request because they had filed a notice of appeal (*id.* at 3), Plaintiffs withdrew their appeal in November 2009 (Dkt. No. 40) and filed the Amended Complaint on February 11, 2010, (Dkt. No. 45).  The present motions were fully submitted on January 28, 2011, and the Court held oral argument on June 15, 2011.

## II.  Discussion

### A.  Standards of Review

#### 1.  Rule 12(b)(1)

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (citing *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 93-102 (1998)).  If a court lacks subject matter jurisdiction over a claim, the claim must be dismissed as the court "lacks the statutory or constitutional power to adjudicate it."  *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam) (internal quotation marks omitted); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("If a court perceives at any stage of the proceedings that it lacks subject matter jurisdiction, then it must take proper notice of the defect by dismissing the action.").  "The plaintiff bears the burden of

---

[4] Curiously, despite their apparent conviction at the time that *Spinelli* warranted the Court's reconsideration of its July 28, 2009 Opinion, Plaintiffs do not cite *Spinelli* in any of their papers in opposition to the present motions.

proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). In deciding a motion to dismiss pursuant to Rule 12(b)(1), the Court "take[s] all facts alleged in the complaint as true and draw[s] all reasonable inferences in favor of [the] plaintiff." *NRDC v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation marks omitted). However, "[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (internal quotation marks omitted). "In resolving a motion to dismiss . . . under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings," *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), but it "may not rely on conclusory or hearsay statements contained in" such evidence, *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).

### 2. Rule 12(b)(6)

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) ("We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo, accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration,

citations, and internal quotation marks omitted).  Instead, the Supreme Court has emphasized

that "[f]actual allegations must be enough to raise a right to relief above the speculative level,"

*id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege

"enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  If a plaintiff

"ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint

must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining

whether a complaint states a plausible claim for relief will . . . be a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.  But where

the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled

to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

    B.  Analysis

       1.  Takings Claim

    In *TZ Manor I*, this Court dismissed Plaintiffs' takings claim without prejudice because it

was not ripe under *Williamson County Regional Planning Commission v. Hamilton Bank of*

*Johnson City*, 473 U.S. 172 (1985).  *See TZ Manor I*, 2009 WL 2242436, at *4-8.  Specifically,

Plaintiffs had not pled facts showing that they had sought compensation from the State for the

alleged taking before filing their Complaint, as required by *Williamson*.  *Id.* at *5 (citing *Island*

*Park, LLC v. CSX Transp.*, 559 F.3d 96, 109 (2d Cir. 2009); *Murphy v. New Milford Zoning*

11

*Comm'n*, 402 F.3d 342, 348-49 (2d Cir. 2005)).  The Court found unpersuasive Plaintiffs'

arguments that the ripeness requirement should have been deemed satisfied in this case.  *Id.* at

*6-8.

The Amended Complaint reasserts the takings claim in Count 3 (Am. Compl. ¶¶ 81-83),

but it again pleads no additional facts suggesting that Plaintiffs have satisfied the ripeness

requirement, i.e., that they have "sought [compensation] from the state if it has a reasonable,

certain and adequate provision for obtaining compensation," *Island Park*, 559 F.3d at 109

(internal quotation marks omitted), which New York does, as this Court held in its prior opinion,

*see TZ Manor I*, 2009 WL 2242436, at *6-7.   The State Defendants therefore move to dismiss

this claim pursuant to Rule 12(b)(1).  (Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl.

("State Defs.' Mem.") (Dkt. No. 57) 21.)  Plaintiffs' opposition memorandum is given over

*entirely* to defending Plaintiffs' *substantive* due process claims, and Plaintiffs do not respond to

Defendants' argument.  (*See* Pls.' Mem. of Law in Opp'n to Defs.' Mots. to Dismiss the Am.

Compl. ("Pls.' Mem.") (Dkt. No. 62).)  The Court agrees with Defendants that nothing alleged in

the Amended Complaint alters its prior conclusion that the takings claim is unripe.  The claim

must therefore be dismissed without prejudice to refiling if and when Plaintiffs take the requisite

actions necessary to make the claim ripe for review on the merits.  *See TZ Manor I*, 2009 WL

2242436, at *8.[5]

---

[5] In their reply papers, the State Defendants argue that Plaintiffs' substantive due process
claim must be dismissed as well because it is nothing more than a dressed-up takings claim, and
"[s]ubstantive due process claims cannot be maintained where a specific constitutional provision
applies to the conduct at issue."  (Reply Mem. of Law in Further Supp. of State Defs.' Mot. to
Dismiss the Am. Compl. (Dkt. No. 64) 8 (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).)
This is not an unfair reading of the "substantive due process" claim, as Plaintiffs themselves
characterize the events giving rise to it as an "outright taking."  (Pls.' Mem. 6.)
 It is well established that "[w]here a particular Amendment 'provides an explicit textual

source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright*, 510 U.S. at 273 (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  More recently, in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, a plurality of the Supreme Court cited this rule in rejecting the application of substantive due process where the Takings Clause would cover the conduct alleged — in that case, a judicial decision allegedly taking the property rights of littoral landowners along Florida's coast.  *See* 130 S. Ct. 2592, 2606 (2010) ("The first problem with using Substantive Due Process to do the work of the Takings Clause is that we have held it cannot be done." (citing *Albright*, 510 U.S. at 273)).  The Second Circuit, in a Summary Order, recently affirmed the dismissal of a substantive due process challenge to a New York City rent stabilization law where the plaintiffs also asserted that the law violated the Takings Clause, citing *Stop the Beach*'s discussion of *Albright*.  *See Harmon v. Markus*, 412 F. App'x 420, 423 (2d Cir. 2011).

The issue, however, is not so simple.  *Stop the Beach*'s discussion was not a holding, and in his concurrence, Justice Kennedy preferred not to decide whether a judicial decision can effect a "taking" for Fifth Amendment purposes; instead, he felt that "[i]f a judicial decision, as opposed to an act of the executive or the legislature, eliminates an established property right, the judgment could be set aside as a deprivation of property without due process of law."  *Stop the Beach*, 130 S. Ct. at 2614 (Kennedy, J., joined by Sotomayor, J., concurring in part and concurring in the judgment).  In addition, the Supreme Court has held that the due process and Takings Clauses protect against different governmental actions:

> The [Takings] Clause expressly requires compensation where government takes private property "*for public use*."  It does not bar government from interfering with property rights, but rather requires compensation "in the event of *otherwise proper interference* amounting to a taking."  Conversely, if a government action is found to be impermissible — for instance because it fails to meet the "public use" requirement or is so arbitrary as to violate due process — that is the end of the inquiry.  No amount of compensation can authorize such action.

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (emphasis in original) (citation omitted) (quoting *First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 315 (1987)); *see also Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 960 (9th Cir. 2011) (noting that *Lingle* abrogated prior circuit precedent holding that all substantive due process challenges to land regulation were "preempted" by the Takings Clause); *Garlasco v. Stuart*, 602 F. Supp. 2d 396, 414 n.10 (D. Conn. 2009) (noting that "[a]lthough the Second Circuit does not appear to have expressly ruled on this issue, . . . the Takings Clause does not subsume all substantive due process claims").

In this case, Plaintiffs' substantive due process claim fails on the merits, so the Court does not have to decide whether the possible availability of the Takings Clause to challenge the same underlying conduct prevents the Plaintiffs from asserting the claim at all.

### 2.  Due Process Claims

#### a.  Introduction and Legal Standard

Three of the claims in the Amended Complaint are called "due process claims."  (Am. Compl. ¶¶ 74, 79, 96.)  Each is based on the same essential allegation: The State Defendants "extend[ed] Long Hill's tenure" as operator of the Adult Home after the termination of the receivership without any authority for doing so under state law.  (*Id.* ¶ 77.)  This allegedly circumvented the Supreme Court's order that terminated Long Hill's receivership and "any and all rights that Long Hill had to continue in possession and operation of the Adult Home."  (*Id.* ¶ 72.)  Plaintiffs were thus "forc[ed] . . . to cede all . . . rights and indicia of ownership, possession and operation of the Adult Home," and Defendants' actions "conferred upon Long Hill, acting on behalf and as an agent and surrogate of the State Defendants, total and exclusive continuing possession and operation of the Adult Home."  (*Id.*)  This also allegedly resulted in the "confiscat[ion] and redirect[ion] [of] all rents and revenues that derived from the Adult Home [from Plaintiffs] to Long Hill."  (*Id.*)  Separately, Plaintiffs allege that DOH delayed in approving TZ Manor's application for an operating license even though TZ Manor was "fully qualified," only approving part II of the application shortly after this action commenced.  (*Id.* ¶¶ 93, 95.)  This delay prevented TZ Manor from replacing Long Hill as operator until the application's approval in May 2008  (*Id.* ¶¶ 94-95.)  All of these actions were "arbitrary," "capricious," "irrational," and resulted in the deprivation of Plaintiffs' property without due process of law.  (*Id.* ¶¶ 74, 79, 96.)

In *TZ Manor I*, this Court agreed with the State Defendants that Plaintiffs had failed to allege the deprivation of any cognizable property interest by their actions.  *TZ Manor I*, 2009 WL 2242436, at *9-10.  The State Defendants again contend here that the Amended Complaint

alleges no constitutionally protected property interest that the State Defendants infringed.  (State Defs.' Mem. 9-14.)  They also argue that Plaintiffs cannot state a substantive due process claim because nothing alleged in the Amended Complaint rises to the level of the "conscience shocking" state conduct required for such a claim; instead, the State Defendants argue, everything the Amended Complaint says they did was "patently reasonable."  (*Id.* at 15.)  Finally, the State Defendants renew their argument, made first in *TZ Manor I*, that Plaintiffs cannot state a procedural due process claim because they failed to take advantage of available remedies for Defendants' actions in state court.  (*Id.* at 19-21.)  The Court in *TZ Manor I* found no need to address this issue, but noted that the initial Complaint had not pled facts suggesting that the available "postdeprivation remed[ies]" in state court "would be insufficient process."  *TZ Manor I*, 2009 WL 2242436, at \*10 n.8.  For its part, Long Hill argues that Plaintiffs have failed to plead sufficient facts to support a conclusion that Long Hill acted as a state actor for purposes of § 1983.  (Mem. of Law in Supp. of Mot. to Dismiss ("Long Hill Mem.") (Dkt. No. 55) 5-8.)

As this Court noted in *TZ Manor I*, 2009 WL 2242436, at \*8, to state a due process claim for the unlawful deprivation of property, plaintiffs must "first identify a property right, second show that the state has deprived [them] of that right, and third show that the deprivation was effected without due process."  *Local 342, Long Island Pub. Serv. Emps. v. Town Bd.*, 31 F.3d 1191, 1194 (2d Cir. 1994) (emphasis and internal quotation marks omitted).  The first requirement, that a plaintiff must "identify a property interest protected by the Due Process Clause," involves two questions: first, whether some source of law "independent" of the Constitution, such as a state or federal statute, confers a property right on the plaintiff, *Harrington v. Cnty. of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010), and second, whether that right "rises to the level of a legitimate claim of entitlement protected by the Due Process Clause," *id.*

15

(quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005)).  "[T]o claim a protected property interest in a particular administrative benefit or measure, an individual must have 'a legitimate claim of entitlement' in receiving the benefit or measure, not merely 'a unilateral expectation' in a desired administrative outcome."  *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

The second requirement, that "the state has deprived" the plaintiff of his property right, is a restatement of what should go without saying: that the plaintiff must show a causal connection between the defendants' actions and the alleged "deprivation."  *See* 42 U.S.C. § 1983 ("Every person who, under color of [state law], *subjects, or causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." (emphasis added)); *cf. Martinez v. California*, 444 U.S. 277, 284-85 (1980) (noting that "the Fourteenth Amendment protect[s] [a plaintiff] only from deprivation by the '*State* . . . of life . . . without due process of law,'" and holding that plaintiffs' injury — the murder of a relative by a parolee — was "too remote a consequence" of parole board's decision to release parolee to be actionable under § 1983 (emphasis in original)).

### b.  State Action

The Constitution generally limits only the actions of the government and normally only constrains private entities if they are deemed to be state actors.  *See Edmonson v Leesville Concrete Co.*, 500 U.S. 614, 619-20 (1991); *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312-13 (2d Cir. 2003).  Here, the Court concludes that Plaintiffs have alleged facts sufficient to support a conclusion that at least some of Long Hill's alleged conduct was taken under color of law, making Long Hill a state actor for those purposes.

16

The essential question in the "state actor" inquiry is whether "the challenged action of a private party is fairly attributable to the state," *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010) (per curiam) (internal quotation marks omitted), so that "constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis in original).  As the Second Circuit has explained:

> [f]or the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Group Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

The essential facts alleged are that 1) the State Defendants granted Long Hill a temporary operating license for the Adult Home in July 2004 "pending review of any applications for an operating certificate that has been or will be submitted" (Am. Compl. ¶ 51); and 2) the State Defendants "authorize[d] Long Hill to continue to act as interim operator" of the Adult Home after Long Hill's receivership was terminated, (*id.* ¶ 68).  Because Plaintiffs' claims are not based on Defendants' conduct while Long Hill was still serving as receiver, the key question is whether the State Defendants' "authoriz[ation]" of Long Hill to continue to operate the Adult Home after that point turned Long Hill into a state actor.  (*See id.* ¶ 52 (noting that receivership was terminated March 3, 2006); ¶ 75 (claim covers period from March 3, 2006 to May 16,

17

2008))

Plaintiffs do not allege how that authorization was accomplished, but logically the two possibilities are that DOH *forced* Long Hill to continue operating the Adult Home, *see* N.Y. Comp. Codes R. & Regs. tit. 18, § 485.5(j) (outlining procedures operator is to follow when it elects to close a facility, and providing that "[t]he operator shall take no action to close the facility prior to [DOH] approval of [a] plan for closure" that it must submit, *id.* § 485.5(j)(3)), or that DOH and Long Hill came to some sort of an *agreement* whereby Long Hill would operate the Adult Home until DOH approved an application for an operating license submitted by another party.  The latter is what the Amended Complaint suggests.  (Am. Compl. ¶ 51.) Assuming the facts alleged in the Amended Complaint are true, either theory is sufficient to support a conclusion that, in continuing to occupy the Adult Home after March 3, 2006, Long Hill acted under color of state law for § 1983 purposes either on a "compulsion" or "joint action" theory.[6]  *See, e.g.*, *Brentwood Acad.*, 531 U.S. at 296 ("[A] challenged activity may be state action when it results from the State's exercise of 'coercive power' . . . ." (quoting *Blum*, 457 U.S. at 1004)); *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act . . . [i.e., that] the private actor is a willful participant in joint activity with the State or its agents." (internal quotation marks omitted)).

This conclusion comes with an important caveat.  Plaintiffs challenge *both* Long Hill's

_____

[6] The Court need not address whether the Amended Complaint's allegations could support a conclusion that Long Hill had been "delegated a public function by the [s]tate." *Sybalski*, 546 F.3d at 257 (internal quotation marks omitted).

18

continuing presence at the Adult Home *and* Long Hill's specific decision, while there, to retain certain funds from the Adult Home's revenue for itself.  (Am. Compl. ¶ 62.)  As the next section makes clear, the only deprivation of a constitutionally protected "property right" Plaintiffs (arguably) allege adequately is Long Hill's *presence and operation* of a facility located on property that Plaintiffs owned against Plaintiffs' will.  Plaintiffs have only alleged sufficient facts to support a conclusion that DOH was responsible for *that* state of affairs, not that DOH was responsible for everything Long Hill did between March 3, 2006 and May 16, 2008.  To the extent Plaintiffs allege that Long Hill retained funds rightfully owned by Plaintiffs, the Amended Complaint's allegations are insufficient to conclude that *that* act is attributable to a state actor. The Amended Complaint only alleges that Defendant Lawitz told Plaintiffs that DOH "ha[d] no objection" to Long Hill's paying itself from the Adult Home's revenues.  (Am. Compl. ¶ 64.) That is insufficient to establish state action: "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999); *see also Tancredi*, 316 F.3d at 313 ("State approval of an action by a regulated entity does not constitute state action 'where the initiative comes from [the private entity] and not from the State' and the state 'has not put its own weight on the side of the proposed practice by ordering it.'" (alteration in original) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974))); *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 454 (N.D.N.Y. 2006) ("[M]ere acquiescene in or approval of private conduct by a state actor will not transform that private conduct into state action.").  Thus, even if some of Long Hill's conduct, other than its physical presence on Plaintiffs' property, deprived Plaintiffs of a "property right," Plaintiffs have not pled facts showing that the State Defendants were responsible for those deprivations. *Cf. Blum*, 457 U.S. at 1004 (holding that state action only exists where "the State is *responsible*

for the *specific conduct* of which the plaintiff complains" (second emphasis added)); *id.* at 1012 (noting that even if nursing home was exercising a public function in general by providing long-term nursing care, "it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public").

c.  Whether Plaintiffs Adequately Allege Deprivation of a Property Right

As previously discussed, to establish a claim of deprivation of property without due process, a plaintiff must first identify a cognizable property right.  Throughout the history of this case, Plaintiffs' claimed property right has been a moving target.  To begin, the Court reiterates its conclusion in *TZ Manor I* that Plaintiffs did not have a "property right" in receiving an operating license for the Adult Home.  2009 WL 2242436, at *9.  As noted above, no person may operate an adult home without an operating license.  N.Y. Soc. Serv. Law § 460-b(1).  *TZ Manor I* held that the conferral of such a license is not a constitutionally protected property interest because 1) such an interest is only created when there is "no uncertainty regarding [the plaintiff's] entitlement to it under applicable state or local law, and the issuing authority had no discretion to withhold it in his particular case," *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 n.1 (2d Cir. 1999), and 2) New York law vests considerable discretion in DOH to grant operating licenses to Adult Home operators according to broad standards, *see* N.Y. Comp. Codes R. & Regs. tit. 18, § 485.6(a)(1).  *See TZ Manor I*, 2009 WL 2242436, at *9; *see also Spinelli*, 579 F.3d at 169 (noting that "a person does not have a protected interest in a possible future business license" (alteration and internal quotation marks omitted)).

In *TZ Manor I*, this Court dismissed Plaintiffs' due process claims because it was not clear "what property right [Plaintiffs] believe they were denied without due process of law" apart

from the operating license, and a claim based on the license itself failed as a matter of law. 2009 WL 2242436, at *9. Plaintiffs do not challenge this latter conclusion per se. Indeed, they strenuously protest that their due process claims do not rely on an alleged property right in being appointed the Adult Home's operator after the Adult Home exited receivership. (Pls.' Mem. 6 ("Plaintiffs are not complaining about a mere withholding of a permit or variance."); *id.* at 12 ("Plaintiffs' claim is not based upon, and therefore does not raise any issue of whether they had a 'legitimate claim of entitlement' in the denial of some 'public benefit.'"); *id.* at 15 ("Plaintiffs [*sic*] complaint is not that they were deprived of the operating certificate.").) Plaintiffs now attempt to proceed on due process claims based on a number of other asserted "property rights." But it is still important to remember that Plaintiffs did not have a property interest in the operating license itself because several of the theories on which Plaintiffs' due process claims *are* purportedly based ultimately, even if implicitly, rely on that conclusion.

Plaintiffs first focus on rent payments. (Pls.' Mem. 13-15.) There are actually two sets of rents that might be at issue in this case. The first are the rents paid by the residents of the Adult Home to the operator. *See* N.Y. Soc. Serv. Law § 461-c(1)-(2) (requiring that every operator of an adult care facility execute an agreement with each applicant for admission detailing, among other things, all charges that the operator will impose for any services provided). It appears that Plaintiffs think their due process claim is based in part on this set of rents. (Am. Compl. ¶ 62 (alleging that "Long Hill [had] been improperly paying itself and others fees from the funds from the residents of the Facility"); ¶ 72(c) (alleging that Defendants "confiscat[ed] and redirect[ed] all rents and revenues that derived from the Adult Home to Long Hill"); Pls.' Mem. 13 ("Defendants diverted the rents paid by the residents of the Adult Home.").) But Plaintiffs cannot have had a property right in these rents because they had no

protectable right to the operating license required in order to serve as the Adult Home's operator. In other words, Plaintiffs are claiming that they were deprived of property the entitlement to which only an operating license would guarantee; because they lack a protected property interest in the license, they also must lack a property interest in rights deriving from the license. Plaintiffs implicitly concede this.  (Pls.' Mem. 13-14 ("It was not [Defendants'] property to take, even if Plaintiffs could not collect those rents").)  Plaintiffs cannot base a due process claim on the deprivation of property that was not theirs.

A second possibility is that, as Lawitz noted in his July 24, 2007 email to Plaintiffs, ordinarily an operator of an adult home will pay rents or some other fee to the owner of the facility.  (Am. Compl. ¶ 68.)  However, the Amended Complaint does not allege anything the State Defendants did to prevent Pondview and Parkfield, the owners of the Property, from collecting whatever rents they were owed by Long Hill, if any.  To the extent the claim is that Long Hill's failure to pay deprived Plaintiffs of the rents they *should* have received from it, the Amended Complaint does not allege that the owners had any contract with Long Hill *obligating* it to pay — indeed, a major point of Plaintiffs' case is that Long Hill was occupying the Adult Home without any legal relationship with Plaintiffs.  (Am. Compl. ¶ 60 (noting that Long Hill had "*no current appointment or contract* with the owners of the facility" other than one "Consulting Agreement" which was not operable (emphasis in original)); ¶ 68 (Lawitz's statement that "[b]ecause of the unique and litigious circumstances in this case, there is no current lease between the real property owner and the interim operator").)  And, even assuming Long Hill *was* obligated to pay Plaintiffs on some theory, as noted earlier the Amended Complaint alleges no facts suggesting its failure to do so was actionable under § 1983.  To the extent the claim is that the State Defendants prevented TZ Manor from serving as operator, and

thus deprived Pondview and Parkfield of rent payments they would have received from TZ Manor, that claim again depends on the false assertion that TZ Manor had a property "right" to an operating license, which it did not.

Finally, Plaintiffs assert that they were owed rents pursuant to N.Y. Social Services Law § 461-f(4)(b), which guarantees that a receiver appointed by DOH shall pay a "reasonable monthly rental for the facility." (Pls.' Mem. 7.) The Court will discuss receivership further in the next section, but suffice to say at this point that Plaintiffs' argument fails because the "reasonable rent" provision, § 461-f(4)(b), only applies when DOH "revokes or temporarily suspends the operating certificate of [a] facility and the commissioner determines that the appointment of a receiver is necessary." *Id.* § 461-f(4)(a). This is not what the Amended Complaint alleged happened here, and, more to the point, there is no basis for the premise of Plaintiffs' argument: that DOH *had* to have used *this* procedure in the circumstances of this case. Indeed, the statutes make clear that appointment of a receiver, either by agreement between DOH and the operator or via court order, is a decision entirely within DOH's discretion. *See id.* § 461-f(1) ("[I]t *may* become necessary under certain circumstances to authorize the continuing operation of such facility for a temporary period by a court appointed receiver, *at the discretion of the commissioner*, . . . or . . . a receiver *approved by* [DOH]." (emphasis added)); *id.* § 461-f(6) ("Nothing contained in this section shall be construed to require the commissioner to seek the appointment of a receiver or to assume the responsibilities of a receiver directly or indirectly through his designee; nor shall this section authorize any court to compel the commissioner to assume the responsibilities of a receiver or to appoint a designee to assume such responsibilities."); *see also Carrier v. Salvation Army*, 667 N.E.2d 328, 330 (N.Y. 1996) (holding that adult-care facility's residents lacked a private right of action to seek appointment of

23

a receiver under N.Y. Social Services Law § 460-d(5), in part because the decision to seek such appointment is committed to DOH's "*discretionary* authority" (emphasis in original)).  Thus, Plaintiffs had no entitlement to the "reasonable rent" referred to in § 461-f(4)(b).

Apart from rent payments, Plaintiffs also argue that Defendants deprived them of their "rights and indicia of ownership, possession and operation of the Adult Home" by "conferr[ing] upon Long Hill . . . total and exclusive continuing possession and operation" of the Adult Home. (Am. Compl. ¶ 72(b).)  It cannot be disputed that Plaintiffs have protected rights in the Property and the Adult Home located there, which they allege they own.  (*Id.* ¶¶ 23-30.)  Plaintiffs do not allege that anything the Defendants did infringed their rights to *own* the Property or the Home. They do, however, argue that Defendants interfered with their possessory rights in two ways: first, DOH authorized Long Hill to remain on the Property operating the Adult Home without Plaintiffs' consent.  (*Id.* ¶¶ 54, 59, 68.)  Second, Plaintiffs argue "they had the absolute right to close down the facility and convert it to any other lawful and profitable use."  (Pls.' Mem. 14.)

Taking the latter first, DOH argues that Plaintiffs lacked an "absolute" right to close the Adult Home because, as a matter of state law, DOH must approve plans to close an adult home. *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 485.5(j) (outlining procedures by which operator may close adult-care facility, under which operator must get DOH's approval of closure plan). That does not mean, however, that Plaintiffs lacked *any* right to determine the use of the Property — indeed, Plaintiffs' agreement with HUD, from which they acquired the Property via foreclosure deed, expressly contemplates that Plaintiffs could "choose[] to change the use of the facility and cease the provision of current services," whether or not TZ Manor acquired an operating license.  (Letter from Sanford F. Young, Esq. to the Ct. (June 22, 2011) Ex. at unnumbered 13 (Rider 1 to Foreclosure Sale Use Agreement between Plaintiffs and HUD dated

24

Oct. 4, 2002).)  This theory is somewhat inconsistent with the actual facts as alleged in the Amended Complaint, however, which make quite clear that Plaintiffs wanted to operate the Adult Home themselves.  DOH is not alleged to have *prevented* Plaintiffs from *seeking* the required operating license — indeed, the State Defendants ultimately granted TZ Manor's application.  It was DOH's separate decision not to grant TZ Manor an operating license until 2008 that "deprived" Plaintiffs of the ability to operate the home, but, again, Plaintiffs did not have any property *right* to receive the ability to do so under state law.

Plaintiffs' most persuasive property rights theory is also their simplest — that Long Hill physically occupied Plaintiffs' property either pursuant to DOH directive or by agreement with DOH without Plaintiffs' consent.  (Am. Compl. ¶ 54; Pls.' Mem. 6, 12-13.)  Certainly, if the state deprives an owner of the "right to exclude" an unwanted occupier from his property, that infringes the owner's property rights.  *See Seawall Assocs. v. City of New York*, 542 N.E.2d 1059, 1063 (N.Y. 1989) ("Under the traditional conception of property, the most important of the various rights of an owner is the right of possession which includes the right to exclude others from occupying or using the space.").  The State Defendants respond that they did nothing that *deprived* Plaintiffs of their *right* to exclude Long Hill — via an action for ejectment, for instance.  (State Defs.' Mem. 15.)   It is true that nothing alleged in the Amended Complaint suggests Defendants *prevented* Plaintiffs from removing Long Hill via the appointment of a new operator (after all, TZ Manor was able to apply for an operating license and Long Hill was displaced when DOH ultimately granted TZ Manor's application).  There are also no allegations that Defendants attempted to interfere with Plaintiffs' ability to oust Long Hill through some

other mechanism.[7]  But even so, the Amended Complaint alleges that the Defendants occupied

Plaintiffs' property for a period of time and that Plaintiffs could not "take over the control,

possession, occupancy and operation" of the Adult Home between March 2006 and May 2008,

during which time Plaintiffs owned the Property.  (Am. Compl. ¶ 56.)  Plaintiffs did not have a

right to "operate" the Home, nor a complete right to "control" it given that DOH

comprehensively regulates adult-care facilities.  But the Amended Complaint does state facts

suggesting Plaintiffs were deprived of their exclusive "possession" and "occupancy" of their

property, as Long Hill was present there allegedly at DOH's behest and against Plaintiffs' will.

(*Id.* ¶ 54.)  The Court will assume, for purposes of these motions, that this is sufficient to allege a

deprivation of a cognizable property right for due process purposes.  *See Spinelli*, 579 F.3d at

174 ("It is now well settled that a temporary, non-final deprivation of property is nonetheless a

deprivation in the terms of the Fourteenth Amendment." (alterations and internal quotation

marks omitted) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972))).

> d.  Whether the Deprivation Was a Substantive Due Process Violation

The next question is whether the temporary deprivation of Plaintiffs' exclusive

possession and occupancy of the Property is cognizable as a substantive due process claim.[8]

---

[7] The Amended Complaint alleges that Plaintiffs "lawfully sought to exclude Long Hill from continuing its possession, occupancy and operation of Tappan Zee Manor" (Am. Compl. ¶ 54), but contains no specifics whatsoever.  The Court assumes, therefore, that what ¶ 54 refers to is either Plaintiffs' communications with DOH officials seeking an explanation for DOH's actions or, possibly, TZ Manor's operating license application.  Leaving aside the allegations that DOH delayed in acting on the application, which, as discussed *infra*, may not be the basis for a substantive or procedural due process claim, the Amended Complaint contains no other facts suggesting the Defendants did anything to interfere with these efforts.

[8] Plaintiffs did not defend their claim as a *procedural* due process claim in their motion papers.  And, at oral argument, Plaintiffs' counsel elected only to defend the substantive due process claim.  To the extent a procedural due process claim is asserted, it must be dismissed.  If

"[S]ubstantive due process does not entitle federal courts to examine every alleged violation of

state law."  *Kuck v. Danaher*, 600 F.3d 159, 167 (2d Cir. 2010); *cf. Pollnow v. Glennon*, 757

F.2d 496, 501 (2d Cir. 1985) ("[A] violation of state law is not cognizable under § 1983.").  As

the Supreme Court has emphasized, "in a due process challenge to executive action, the

threshold question is whether the behavior of the governmental officer is so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience."  *Cnty. of*

*Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also Okin v. Vill. of Cornwall-on-*

*Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (same); *Natale*, 170 F.3d at 262 ("For

state action to be taken in violation of the requirements of substantive due process, the denial

---

the claim is based on DOH's delay in approving TZ Manor's operating license application, nothing changes this Court's view, expressed in *TZ Manor I*, that an Article 78 proceeding (which Plaintiffs do not allege they brought) would have been an adequate remedy to address that delay.  *See TZ Manor I*, 2009 WL 2242436, at *10 n.8; *see also N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 168 (2d Cir. 2001) (holding that Article 78 proceedings provide an adequate remedy for unreasonable delay on the part of a state agency).

   Further, Plaintiffs do not explain why they did not have an adequate postdeprivation remedy under state law for the alleged occupation of their property.  Under *Parratt v. Taylor*, 451 U.S. 527 (1981) and *Hudson v. Palmer*, 468 U.S. 517 (1984), "when a meaningful post-deprivation remedy [is] available at state law," a state employee's intentional deprivation of property "[is] not actionable under § 1983" when the deprivation is "random and unauthorized," as opposed to one made pursuant to "an established state procedure."  *Alexandre v. Cortes*, 140 F.3d 406, 411 (2d Cir. 1998) (internal quotation marks omitted).  Here, there is no allegation that the Defendants acted pursuant to such a procedure, and Plaintiffs do not explain why either a common law action for trespass (or something similar), or an Article 78 proceeding, would not have been an adequate remedy for the temporary occupation of the Adult Home by Long Hill, especially given Plaintiffs' conviction that Long Hill was there without any legal basis.  *Cf. Cornett v. Brown*, No. 04-CV-754, 2006 WL 845568, at *16 (E.D.N.Y. Mar. 30, 2006) (dismissing § 1983 claim alleging deprivation of plaintiff's temporary residence and personal property because "post-deprivation remedies (such as replevin and trespass to chattels)" were "available under state law"), *aff'd sub nom. Cornett v. Jamison*, 326 F. App'x 624 (2d Cir. 2009) (summary order); *Hughes Vill. Rest., Inc. v. Vill. of Castleton-on-Hudson*, 848 N.Y.S.2d 384, 387 (App. Div. 2007) (holding that Article 78 proceeding was adequate postdeprivation remedy for village's alleged "wrongful closure" of plaintiff's apartment building).  The *Parratt* rule does not, however, bar Plaintiffs' substantive due process claims.  *See Robison v. Via*, 821 F.2d 913, 925 (2d Cir. 1987); *McClary v. O'Hare*, 786 F.2d 83, 86 n.3 (2d Cir. 1986).

must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.'"). To state a substantive due process claim, the government conduct alleged must be "so outrageously arbitrary as to constitute a gross abuse of governmental authority," *Natale*, 170 F.3d at 263; "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Lewis*, 523 U.S. at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 130 (1992)). Contrary to Plaintiffs' assertions (Pls.' Mem. 5-6), a court may resolve at the motion to dismiss stage whether the allegations in a complaint, accepted as true, rise to the level sufficient to support a substantive due process claim. *See, e.g.*, *Kuck*, 600 F.3d at 162, 167 (affirming Rule 12(b)(6) dismissal of substantive due process claim because the deprivation alleged did not meet the "shock the contemporary conscience" standard); *Lombardi v. Whitman*, 485 F.3d 73, 74 (2d Cir. 2007) (same, affirming dismissal of substantive due process claim based on the "complaint's allegations").

The State Defendants argue that their alleged actions, as they are described in the Amended Complaint, were "entirely rational" because at the time Long Hill stopped serving as receiver, "no other individual or entity . . . had been approved to operate the adult home." (State Defs.' Mem. 16.) "Had DOH not approved Long Hill to remain as the temporary operator, it would have been compelled under State law to close the adult home and require that all of the home's residents be moved from their familiar surroundings to other facilities." DOH did not want to do this unless "absolutely necessary." (*Id.*) (This same explanation is contained in Lawitz's July 24, 2007 email to Plaintiffs. (Am. Compl. ¶ 68.)) Thus, say the State Defendants, their actions were per se not "arbitrary or irrational."

Plaintiffs respond that nothing in State law authorized DOH to do what it is alleged it did: authorize Long Hill to serve as temporary operator (without serving as receiver as well)

until DOH approved a new operating license for TZ Manor.  (Pls.' Mem. 6-8; *see also* Am.

Compl. ¶ 63 (alleging that Defendant Lawitz told Plaintiffs that DOH had authorized Long Hill

to operate the Adult Home "pending approval of an application for change of operator").)  Thus,

according to Plaintiffs,  DOH's actions were "ultra vires" and actionable as a substantive due

process violation.  (Pls.' Mem. 8.)

  For support, Plaintiffs rely on *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778 (2d Cir.

2007).  (Pls.' Mem. 9-10.)  In *Cine SK8*, the plaintiff claimed that a town board had "amended" a

special use permit he held for certain property based on racial animus, thus violating (among

other things) his substantive due process rights.  507 F.3d at 782-83.  The Second Circuit

reversed a grant of summary judgment in the defendants' favor on this claim, concluding that the

property owner had produced sufficient evidence that the town board's actions had been

motivated by impermissible racial considerations.  *See id.* at 785-89.  The court went on to note

that "[e]ven in the absence of the evidence of racial animus, the [town board's] actions were

likely sufficiently arbitrary or irrational to preclude granting summary judgment to defendants."

*Id.* at 789.  Specifically, the town code provided the board authority to revoke or suspend a

permit, but not the authority to *amend* one.  *Id.*  Thus, the board's amendment of plaintiff's

special use permit was "ultra vires and, as a result, sufficiently arbitrary to amount to a

substantive due process violation."  *Id.*  Additionally, assuming the board *had* the power to

amend permits, it failed to follow "the procedural requirements" in the town code in the

plaintiff's case.  *Id.* at 790.  Thus, there were genuine questions of fact regarding "whether the

process by which the [town board] amended the special use permit was 'tainted with

fundamental procedural irregularity' and hence sufficiently arbitrary to rise to a substantive due

process violation."  *Id.* (quoting *Natale*, 170 F.3d at 262).

*Cine SK8* can be read broadly to stand for the proposition that any governmental action

taken outside the scope of the defendant's authority, i.e., an "ultra vires" act, is "sufficiently

arbitrary to amount to a substantive due process violation." *Id.* at 789; *cf. Brady v. Town of

*Colchester*, 863 F.2d 205, 215-16 (2d Cir. 1988) (reversing grant of summary judgment to

defendants on substantive due process claim where question of fact existed regarding whether

defendant zoning board took actions with "no authority under state law" to do so).[9]  As an

example of an application of *Cine SK8*, in *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL

3978208 (E.D.N.Y. Aug. 21, 2008), municipal defendants sought to regulate fishing equipment

that the plaintiff fisherman had placed in the town harbor.  2008 WL 3978208, at *13.  The court

denied the defendants' motion for summary judgment on the substantive due process claim in

part because the town was "not legally authorized to regulate fishing" in the harbor and there

was a question of fact regarding whether the items "pos[ed] a hazard to navigation," the only

basis on which the town could regulate them.  *Id.* at *14.  If the town lacked authority to

regulate, its actions could constitute a substantive due process violation.  *Id.* (citing *Cine SK8*,

507 F.3d at 789).  There was also evidence that the town's actions were motivated by personal

--------

[9] *Cine SK8*'s rule is similar to those cases in which the Second Circuit has held that the denial of a discretionary property benefit based on the government's imposition of a prerequisite that had no basis in applicable law can constitute a deprivation of a "property right" to which the plaintiff can claim an entitlement for due process purposes.  *See, e.g.*, *Sullivan v. Town of Salem*, 805 F.2d 81, 85 (2d Cir. 1986) (reversing grant of summary judgment where building official denied plaintiff certificate of occupancy based on a requirement that had "no lawful basis," and "[n]o question was raised as to matters over which the building official might have discretionary authority"); *see also Dean Tarry Corp. v. Friedlander*, 826 F.2d 210, 213 (2d Cir. 1987) (noting that in *Sullivan*, the unlawful requirement "came out of thin air" and was not "derived from an existing legislative or administrative standard"); *Osborne v. Fernandez*, No. 06-CV-4127, 2009 WL 884697, at *39 (S.D.N.Y. Mar. 31, 2009) (describing *Sullivan* and *Dean Tarry* as cases involving the imposition of "ultra vires requirements" by government officials).  These cases are distinct from *Cine SK8*, however, because they are about whether a "property right" existed as a matter of *state* law, not whether the deprivation of that right violated the *federal* constitution.

animus.  *Id.*  In another recent case, the District of Connecticut refused to dismiss a substantive due process claim where the allegations were that a town agency "abused [its] authority by issuing Notices of Violation, delivering Cease and Desist Orders, and impairing [plaintiff's] title without possessing any jurisdiction over the [p]roperty" at issue.  *Watrous v. Town of Preston*, No. 10-CV-597, 2011 WL 1743508, at *7 (D. Conn. May 3, 2011).  Because the court had previously determined that the defendant agency did in fact lack jurisdiction over the property these allegations stated a substantive due process claim.  *See id.* at *8.  The plaintiff in *Watrous* had also pled facts supporting a conclusion that the defendants acted intentionally to deprive him of his valid property interest.  *Id.* at *6-7.

This Court must follow *Cine SK8* while keeping in mind that the Second Circuit has also held "numerous times" that "substantive due process does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit[;] [its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 505 (2d Cir. 2001) (internal quotation marks omitted).  Indeed, the Second Circuit (and other courts, for that matter), has made clear that a governmental act that is unauthorized by, or that even *violates*, state or local law, is not *per se* "conscience shocking" or "egregious" for federal constitutional purposes or "arbitrary in the constitutional sense."  *See, e.g.*, *Kuck*, 600 F.3d at 167 (affirming dismissal of substantive due process claim based on state official's requiring the plaintiff to produce certain documents before receiving a permit to carry a firearm, noting that "[w]hether authorized or not," the defendants' actions were "hardly outrageous or shocking"); *accord Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 145 (2d Cir. 1994) ("Overzealous or erroneous government action alone does not give rise to a constitutional

violation."); *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989) (affirming dismissal of

substantive due process claim based on student's suspension that allegedly violated state law, as

defendant's acts were not "arbitrary or irrational or motivated by bad faith" and "that the

defendant's construction of state law governing expulsions may be erroneous . . . is not the

issue" (internal quotation marks omitted)).[10]

---

[10] For further authority on the proposition that governmental acts taken ultra vires or
otherwise without authority in or in violation of state or local law do not necessarily violate
substantive due process, see *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010) ("The burden to show
state conduct that shocks the conscience is extremely high, requiring stunning evidence of
arbitrariness and caprice that extends beyond mere violations of state law, even violations
resulting from bad faith to something more egregious and extreme." (internal quotation marks
omitted)); *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 948-49 (10th Cir. 2003) (holding that
promulgation and enforcement of fee by municipality did not violate substantive due process,
noting that even though plaintiffs argued fees were "not authorized by municipal ordinances,"
"violations of state and local law do not create claims pursuant to § 1983"); *Sameric Corp. of
Del., Inc. v. City of Philadelphia*, 142 F.3d 582, 594 (3d Cir. 1998) (holding that city agency's
designation of building as historic based on a consideration not provided for in the governing
ordinance, while in "exce[ss] [of] [agency's] authority to the extent that it based its decision
upon such a motivation," was only an "error . . . of law, and such an error is not sufficient in
itself to establish a substantive due process claim"); *WMX Techs., Inc. v. Gasconade Cnty.*, 105
F.3d 1195, 1200 (8th Cir. 1997) ("[E]ven if, as appellants contend, the ordinance is substantially
inconsistent with state law and therefore without basis in state law, appellants nevertheless fail to
state a federal substantive due process claim . . . ."); *Hartland Sportsman's Club, Inc. v. Town of
Delafield*, 35 F.3d 1198, 1201-02 (7th Cir. 1994) (although town "lacked statutory authority" to
take particular action, "[t]he [t]own's zoning action in violation of state law . . . does not in itself
rise to the level of a violation of substantive due process"); *N.Y. State Rest. Ass'n v. N.Y.C. Dep't
of Health & Mental Hygiene*, 303 F. Supp. 2d 265, 271-73 (E.D.N.Y. 2004) (holding that newly
promulgated restaurant inspection procedures and penalties, even if adopted in a manner that
violated city code and administrative procedure act, did not violate plaintiffs' substantive due
process rights as they were not "oppressive" or "without any reasonable justification" (internal
quotation marks omitted)); *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 283-85
(E.D.N.Y. 2002) (granting summary judgment against plaintiffs on substantive due process
claim in challenge to policies of city taxi commission, concluding that whether the policies were
unauthorized by city administrative code or were adopted in manner that violated city charter
could not establish whether defendants "exercis[ed] . . . power in an arbitrary or oppressive
way," as would support a substantive due process claim), *aff'd*, 60 F. App'x 861 (2d Cir. 2003)
(summary order); *cf. Natale*, 170 F.3d at 263-64 (holding that a purported property interest is not
a "clear entitlement" for due process purposes when there is "[u]ncertainty as to the meaning of
applicable [state or local] law," and concluding that plaintiff had not proved substantive due

DOH authorized Long Hill to act as temporary operator after Long Hill ended its tenure as receiver (during which Long Hill had been approved as an operator), in a situation in which no other person or entity was authorized to run the Adult Home.  (Am. Compl. ¶ 68.)  The State Defendants argue that their actions were consistent with state law by invoking N.Y. Social Services Law § 460, which declares the New York legislature's "policy" and "purpose":

> Residential care programs for adults and children of the highest quality, efficiently produced and properly utilized at a reasonable cost, are a matter of vital concern to the people of this state.  In order to more effectively protect and assure the life, health, safety and comfort of adults and children who must be cared for away from their own homes, the department of social services acting directly or through social services districts, and with the cooperation of other state agencies, shall have the comprehensive responsibility for the development and administration of programs, standards and methods of operation, and all other matters of state policy, with respect to residential care programs for children and adults and all facilities and agencies, whether public or private, which are subject to the provisions of this article.

N.Y. Soc. Serv. Law § 460.[11]  (State Defs.' Mem. 17-18.)  As a general matter, this provision clearly gives DOH broad authority to regulate and "administ[er]" adult-care facilities.  Surely it does not authorize DOH to do anything it likes at those facilities, particularly where, as Plaintiffs

---

process violation when the asserted property right "turned ultimately" on a "state law dispute" that was a "legitimate dispute" before being resolved in plaintiff's favor by a state court); *Sherman v. Town of Chester*, No. 01-CV-8884, 2001 WL 1448613, at *3 (S.D.N.Y. Nov. 15, 2001) (holding that *Pullman* abstention was inapplicable to substantive due process claim challenging town's moratorium on development that resulted in rejection of permit application, noting that "[t]he resolution of the federal question does not 'depend' on the resolution of . . . whether the Town acted *ultra vires* under [the New York Home Rule Law] in enacting the [challenged restriction]").  *But cf. Conroe Creosoting Co. v. Montgomery Cnty.*, 249 F.3d 337, 342 (5th Cir. 2001) (questions of fact precluded summary judgment on substantive due process claim where county tax assessor, concededly without authority, converted tax deficiency into forced sale of plaintiff's entire business *and* jury could find that assessor's conduct was intentional, that he signed false affidavit, and that he selected his friends as auctioneers).

[11] As the State Defendants point out, DOH now exercises the authority previously held by the New York State Department of Social Services.  (State Defs.' Mem. 4.)

allege happened, it might infringe someone else's rights. (No doubt in *Cine SK8* the town board had authority generally to regulate the uses of property within the town, but that did not prevent the Second Circuit from concluding that it lacked authority to take the specific action alleged by the plaintiff. *See Cine SK8*, 507 F.3d at 789.) But the provision is still important because it suggests DOH retains significant discretion in deciding how to administer and regulate adult-care facilities, and that it does so with the goal of "protect[ing] and assur[ing] the life, health, safety and comfort" of residents.

At a more specific level, the receivership provision of the Social Services Law, § 461-f, suggests that DOH's actions as alleged here had at least an arguable basis in state law. The statutes governing adult-care facilities provide for receivership in three situations. First, "[t]he operator" of an adult home may request that DOH appoint a receiver, whereupon, if DOH agrees, the operator and DOH enter into an agreement "for the appointment of a receiver to take charge of the facility under whatever conditions as shall be found acceptable by the parties." *Id.* § 461-f(2). The agreement may last only sixty days, but that may be extended for "an additional sixty day period." *Id.* Second, "[i]n the event of a transfer of possession of the premises of such facility from an approved operator to a court appointed receiver in a bankruptcy or mortgage foreclosure proceeding, [DOH] may authorize such court appointed receiver to continue to operate such facility for a temporary period pending the filing and review of an application to [DOH] by such receiver or by another person for an operating certificate . . . ." *Id.* § 461-f(3)(a). The application must be filed "within ninety days after the transfer of possession to the receiver, unless the time for such filing is extended by the department." *Id.* Third, "[w]hen [DOH] revokes or temporarily suspends the operating certificate of such facility and the commissioner determines that the appointment of a receiver is necessary to protect the health, safety and

welfare of the residents of a facility," DOH may apply for an order in state Supreme Court directing "the operators, owners and prime lessors" to show cause why "the commissioner, or at the discretion of the commissioner, his designee, should not be appointed receiver to take charge of the facility." *Id.* § 461-f(4)(a).  DOH may grant a receiver appointed in this manner "an operating certificate the duration of which shall be limited to the duration of the receivership." *Id.* § 461-f(4)(g).  The court may terminate this type of receivership only when six months have elapsed since its commencement (though that may be extended "for good cause"), *id.* § 461-f(4)(e)(i)(a), "when the department grants the facility a new operating certificate," *id.* § 461-f(4)(e)(i)(b), and when the residents of the facility "have been provided alternative modes of care," provided that "residents shall not be removed from the facility unless it is required for the protection of the health, safety or welfare of the residents," *id.* § 461-f(4)(e)(i)(c).

The Amended Complaint in this case does not contain facts suggesting Long Hill became receiver of the Adult Home pursuant to any of the three methods described in § 461-f.  (Am. Compl. ¶ 30 (alleging only that "site control" of the Property was in dispute after Plaintiffs' acquisition of the Property).)  Instead, the Supreme Court appointed a receiver at the request of Plaintiffs after they acquired the Property and sought to evict the remaining parties (including Blatt) that claimed possessory and other rights in it.  *See Pondview Corp. v. Russand, Inc.*, 809 N.Y.S.2d 483, 10 Misc.3d 1054(A), 2005 WL 3240574, at *1 (Sup. Ct. Nov. 14, 2005) (describing underlying state court litigation).  The court did so pursuant to C.P.L.R. § 6401(a), which allows the appointment of a "temporary receiver" "[u]pon motion of a person having an apparent interest in property which is the subject of an action . . . where there is danger that the property will be [inter alia] lost, materially injured or destroyed."  N.Y. C.P.L.R. § 6401(a); *Mar. 24, 2004 Pondview Decision & Order*, slip op. at 11.  The Supreme Court felt the appointment

was appropriate given that Plaintiffs had shown likelihood of success on the merits on their

underlying eviction claim, concluding that Plaintiffs' "rights to the rents and profits of the

facility[] may be irreparably destroyed if [Blatt and the other defendants claiming possessory

rights in the Property] are permitted to remain in the premises." *Id.* at 10.  The court terminated

the receivership on March 3, 2006, when the defendants "surrendered" any "claim(s) to

possession of the subject adult home" they had previously made.  Order, *Pondview Corp. v.

Russand, Inc.*, No. 0822/03, slip op. at 2 (N.Y. Sup. Ct. Mar. 3, 2006).

 Thus, it appears that the purpose of the receivership was to preserve the property's value

while the rights of the various claimants were sorted out.  The most analogous type of

receivership described in § 461-f is where possession of the facility is transferred to a receiver in

the course of a bankruptcy or mortgage foreclosure proceeding.  *See* N.Y. Soc. Serv. Law § 461-

f(3)(a).  In that case, the statutes and regulations are clear that DOH *may* authorize the receiver

to "continue to operate [the] facility for a temporary period pending the filing and review of an

application to [DOH] by . . . another person for an operating certificate."  *Id.*; *see also* N.Y.

Comp. Codes R. & Regs. tit. 18, § 485.9(b)(1).  That is precisely what the Amended Complaint

alleges DOH did here.  (Am. Compl. ¶ 51 (quoting July 6, 2004 notice from DOH to Long Hill

of its authorization to operate the facility "under the provisions of Section 461-f of the Social

Services Law and 18 NYCRR 485.9(b) . . . .").)  Neither the statute nor the regulations say that a

§ 461-f(3) receiver must *relinquish* this authority, or that DOH may not continue to authorize the

ex-receiver to operate the facility, when the receiver's appointment in the underlying bankruptcy

or foreclosure litigation ends.  Indeed, the statute is clear that the receiver's authority may run

"pending the filing and review" of an operating license application, and DOH may extend the

deadline for the filing of such an application at its discretion.  N.Y. Soc. Serv. Law § 461-f(3)(a).

And, notably, while DOH may authorize a receiver appointed via § 461-f(4) to operate a facility only for the duration of the receivership, *see id.* § 461-f(4)(g), receivers appointed under § 461-f(3) are not subject to that limitation, and the statute suggests that DOH may continue its authorization on terms it may specify in each particular case. *See id.* § 461-f(3)(c) (providing that a § 461-f(3) receiver, after obtaining temporary authorization to operate facility, may continue to do so for "so long as he continues . . . in compliance with the applicable law, regulations of the department, and the terms and conditions for such authorization as set by the department).

The Court stresses that it is not making a definitive determination whether Defendants' actions as alleged in this case complied with every jot and tittle of state law — and it need not do so under the well established substantive due process standard.  It is enough to conclude 1) that the statutes and regulations governing DOH's administration of adult homes give it considerable discretion, both generally and in the specific case of receivership; 2) that even if these statutes and regulations governed the circumstances described in the Amended Complaint, in the closest analogous situation provided for in applicable law DOH has discretion to take the actions Plaintiffs allege it took here; and 3) that nothing in that law states or even implies that DOH *lacked* authority to do what it did.[12]   *Cf. Cine SK8*, 507 F.3d at 789 (noting that town code specifically *required* suspension or revocation of special use permit, after notice and a hearing, under certain circumstances and allowed for issuance of new permit after revocation, but

---

[12] The Amended Complaint does not allege facts supporting Plaintiffs' argument that Defendants "disregarded" the Supreme Court's order terminating Long Hill's receivership. (Pls.' Mem. 6.)  It merely alleges that DOH authorized Long Hill to serve as temporary operator of the facility pending approval of a new permanent operator.  (Am. Compl. ¶¶ 59, 63.)  The Court's review of the remaining statutes and regulations governing adult-care facilities reveals nothing either specifically authorizing or prohibiting DOH's alleged actions.

"ma[de] no provision for the *amendment* of a special use permit in any circumstances"); *Leeandy*

*Dev. Corp. v. Town of Woodbury*, 134 F. Supp. 2d 537, 543 (S.D.N.Y. 2001) (holding that

substantive due process claim could not be stated when defendants' actions had "colorable" basis

in state law). Thus, *Cine SK8* does not support a substantive due process claim in this case.[13]

More generally, even when read in the light most favorable to Plaintiffs, nothing alleged

in the Amended Complaint "shocks the contemporary conscience," suggests egregious conduct,

or constitutes a "*gross abuse*" of governmental authority." As the Second Circuit has explained:

> In gauging the shock, "negligently inflicted harm is categorically beneath the
> threshold," while "conduct intended to injure in some way unjustifiable by any
> government interest is the sort of official action most likely to rise to the
> conscience-shocking level." In between, the Supreme Court has recognized that
> conduct exhibiting "deliberate indifference" to harm can support a substantive
> due process claim, with a potent qualification that has bearing here:
>
>> Deliberate indifference that shocks in one environment may not be
>> so patently egregious in another, and our concern with preserving
>> the constitutional proportions of substantive due process demands
>> an exact analysis of circumstances before any abuse of power is
>> condemned as conscience-shocking.
>
> The conscience recognizes the dilemma of conflicting obligations. In the
> apparent absence of harmless options at the time decisions must be made, an
> attempt to choose the least of evils is not itself shocking.

*Lombardi*, 485 F.3d at 82 (quoting *Lewis*, 523 U.S. at 849-50).

There is absolutely nothing in the Amended Complaint that even suggests that the

---

[13] It also bears noting that the relevant discussion in *Cine SK8* came after the court had
already concluded that there was sufficient evidence to submit to a jury suggesting that the town
board was motivated by racial animus, which was sufficient for the court to reverse the grant of
summary judgment in defendants' favor. Moreover, if the town board's actions were racially
motivated, there was the possibility that the "fundamental procedural irregularit[ies]" the court
identified (if they happened) were not only ultra vires in and of themselves but also further
evidence that the board was acting for impermissible reasons. As discussed below, the Amended
Complaint contains nothing to suggest that analogous facts are present in this case.

Defendants acted with the *intent* to injure Plaintiffs.  Indeed, the Amended Complaint

incorporates Defendant Lawitz's July 24, 2007 email, in which he explains that DOH acted in

response to what it considered to be a "unique" situation in which it "did not wish to take action

to require the closure of the facility and transfer of its residents."[14]  (Am. Compl. ¶ 68.)  Lawitz

also acknowledged the "difficulty" the circumstances created for Plaintiffs, and promised to "try

to continue to expedite" DOH's review of TZ Manor's application.  (*Id.*)  Whether or not this

supports a conclusion that Defendants acted with "deliberate indifference" to the harm caused

Plaintiffs, as *Lewis*, *Lombardi*, and other cases make clear, not all acts that could be

characterized as "deliberate indifference" shock the conscience.  *See O'Connor v. Pierson*, 426

F.3d 187, 203 (2d Cir. 2005) ("'[D]eliberate indifference' can support substantive due process

liability in situations where the government owes a special duty of care to those in its charge.").

Here, where the Defendants were presented with a "unique" situation and were "subjected to the

'pull of competing obligations,'" *Lombardi*, 485 F.3d at 83 — the protection of Plaintiffs' rights

and DOH's obligation to "effectively protect and assure the life, health, safety and comfort of

adults and children who must be cared for away from their own homes," N.Y. Soc. Serv. Law §

460 — Defendants' actions, as alleged in the Amended Complaint, did not shock the conscience

or amount to egregious, arbitrary, or outrageous conduct as a matter of law.  Taking all the facts

---

[14] Plaintiffs argue, without citation to the Amended Complaint, that "issues of fact" exist regarding "the alleged necessity and rationality of [DOH's] conduct." (Pls.' Mem. 17.) Specifically, "[t]he needs of the residents, availability of alternative housing, how far they would have to go (if at all), and what kind of effect this would have on their well being, are all questions of fact that cannot be determined at this stage of the proceeding." (*Id.* at 17-18.) Lawitz's email merely states that the DOH did not consider closing the Adult Home to be a good option under the circumstances. Nothing in the Amended Complaint suggests this was an incorrect judgment, or, more to the point, that DOH was *not* motivated by this understanding, but instead that it acted with an "evil intent to harm" Plaintiffs. *Lombardi*, 485 F.3d at 82.

alleged therein to be true, the Amended Complaint does not state a due process claim, and the claims styled as such (claims 1, 2, 3, and 5) must be dismissed.

### 3.  Equal Protection Claim

Plaintiffs' Equal Protection claim (claims 4 and possibly 5) is based on the allegation that Defendants "arbitrarily and capriciously g[ave] and conferr[ed] upon Long Hill total and exclusive continuing possession and operation of the Adult Home, and confiscat[ed] and redirect[ed] all rents and revenues that derived from the Adult Home to Long Hill, to the exclusion of Plaintiffs."  (Am. Compl. ¶ 85.)  The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated persons alike.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  A plaintiff who does not claim to be a member of a constitutionally protected class may bring an Equal Protection claim on one of two theories: selective enforcement or "class of one."  *See Cobb v. Pozzi*, 363 F.3d 89, 109-10 (2d Cir. 2004).  Both of these theories require plaintiffs to show that they were treated differently from other individuals "similarly situated" to themselves.  *See, e.g.*, *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)) (class-of-one); *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (selective enforcement).  Plaintiffs here make no attempt to argue that they are members of a constitutionally protected class, nor do they allege any similarly situated third parties who Defendants treated differently.  The Equal Protection claim, which was not defended in Plaintiffs' memorandum of law or at oral argument, must therefore be dismissed.[15]

---

[15] Because this Court concludes that Plaintiffs have not stated any federal constitutional claims, the Court need not address the State Defendants' assertion of qualified immunity.  (State Defs.' Mem. 23-24.)

4.  State Law Claims

Having dismissed all of Plaintiffs' federal claims, the Court must determine whether to exercise supplemental jurisdiction over Plaintiffs' state law claims.  (Am. Compl. ¶¶ 98-107.)  In *TZ Manor I*, this Court concluded that this case was undistinguishable from the "usual case in which all federal-law claims are eliminated before trial"; under those circumstances, courts generally should "declin[e] to exercise jurisdiction over the remaining state-law claims."  2009 WL 2242436, at *10 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). That remains the case now.[16]  Therefore, Plaintiffs' state law claims (claims 6, 7, and 8) are dismissed without prejudice to refiling in state court.

_____

[16] Additionally, given the complicated statutory and regulatory schemes at issue in this case, Plaintiffs' state law claims may well "raise[] . . . novel or complex issue[s] of State law," which also gives this Court discretion to decline to exercise supplemental jurisdiction.  28 U.S.C. § 1367(c)(1).

41

III. Conclusion

For the reasons stated herein, Defendants' motions to dismiss are granted in their

entirety.  Plaintiffs' federal claims are dismissed with prejudice, with the exception of Plaintiff's

takings claim, which is dismissed without prejudice to refiling if and when it becomes ripe for

decision.  Plaintiffs' state law claims are dismissed without prejudice to being filed in state

court.  The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. Nos.

54, 56) and close this case.

SO ORDERED.

Dated:        White Plains, New York
              September 27, 2011

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

42

Service List:

Sanford F. Young, Esq.
225 Broadway
New York, NY 10007
(212) 227-9755
sanfordy@aol.com

Scott Joseph Spiegelman
Office of the Attorney General of the State of New York
120 Broadway
New York, NY 10271
(212) 416-8558
scott.spiegelman@oag.state.ny.us

David Eugene Nardolillo
James Armond Shannon
O'Connell & Aronowitz
54 State St.
Albany, NY 12207
(518) 462-5601
dnardolillo@oalaw.com
James.Shannon@wilsonelser.com